IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| GAIL M. RITCHEY, | ) | CASE NO. 1:25-CV-02110 |
| | ) | |
| Petitioner, | ) | JUDGE JOHN ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| WARDEN ERIN MALDONADO, | ) | |
| | ) | |
| Respondent. | ) | |

**PETITIONER'S TRAVERSE IN RESPONSE TO
RESPONDENT'S RETURN OF WRIT**

Petitioner Gail Ritchey, through undersigned counsel, hereby files this

Traverse in Response to the Warden's Return of Writ. Clearly established federal

constitutional law required the state courts to grant Ms. Ritchey a new trial.

This Court should grant the petition.

**INTRODUCTION**

When Gail Ritchey, a scared 21-year old, gave birth, she was in a bathroom of

a home in Shaker Heights, Ohio, nannying two young children who were elsewhere

in the home that weekday afternoon. The baby didn't move. The baby made no

sound. Nothing suggested a live birth to the naked eye. And Gail, afraid and feeling

alone, placed the baby in a garbage bag and put the bag in her car, where the bag

stayed for days.

Eventually, Gail transported the bag from Cuyahoga County to Geauga County and abandoned the bag containing her dead child. Certainly not appropriate behavior -- but also not murder if the child were stillborn or if Gail believed the child were stillborn.

Weeks later, after an opportunity for decomposition in the later winter, after the corpse had been partially mutilated by one or more animals, and after possibly having been run over by a motor vehicle, the corpse was found. By this time, there was evidence of inflation in the one lung that still remained of the partially dismembered corpse. Originally, the examining medical examiner, relying upon a now-discredited "floating lung" test, opined that there was a live birth.

More than a quarter-century later, Gail Ritchey was charged with the aggravated murder and murder of the child. A critical question in the case was whether it could reliably be determined if there was a live birth. The original examining medical examiner had passed away. The State's new expert witness originally adopted the conclusion that there was a live birth on the basis of the previous examiner's floating lung test. When the scientific validity of that test was challenged pretrial by the defense, the prosecution's new expert recanted his opinion that the floating lung test was a valid indicator of live birth under the circumstances of this case. Nonetheless, the new expert believed that a determination of live birth was correct on the basis that there were lung tissue samples – collected from unknown locations presumably on the child's corpse -- that appeared to be inflated.  This conclusion that was based in part on the results

2

of the findings in the original autopsy report and in part on the basis of the new expert's examination of tissue samples whose source he had no way of knowing firsthand.

Ironically, while the trial court was failing to shield the jury from scientific testimony that it should not have considered, the trial court was also preventing the jury from performing its role as the only trier of fact in this criminal trial, in particular with respect to the question of venue. In this case, the jury was responsible for determining in what county the alleged murder took place. Ohio law provides that, in a homicide case, if the jury cannot reasonably ascertain the place where the homicide took place, then the jury can base its venue (i.e. determination of county) finding on the location where the corpse was found. But here, the jury was not given the opportunity to determine if it could reasonably ascertain the county where the homicide took place -- despite having heard a detailed statement from the defendant that explained that she was in Cuyahoga County when she gave birth, that the bag remained in her vehicle which was only in Cuyahoga County for at least the next several days, as well as the State's own expert's conclusion (unreliable as it might be) that the infant survived a matter of minutes or possibly hours.

Instead, the trial court took from the jury the possibility of concluding that the offense occurred in Cuyahoga County -- the jury was given only the opportunity to take the default position of determining in what county the corpse was found.

Effectively, the trial court determined as a matter of law that a conclusion that the offense was committed in Cuyahoga County was unreasonable.

In addition, the trial court prevented the defense from introducing evidence that, under Ohio law, was relevant to Ms. Ritchey's lack of culpability. This evidence would have been presented through the testimony of an expert in dissociative disorder who would have provided the jury with an explanation of how Gail Ritchey was unable to control her actions during the time she was giving birth and why Gail Ritchey. minutes after giving birth, was able to go back to her nannying duties. The expert would have explained that dissociative disorder, a phenomena whose symptoms fit Gail's conduct on the day of the birth, would account for how a woman in Gail's circumstances could have dissociated herself from the birthing and effectively viewed the birth as an out-of-body experience.

In the end, a new trial should be granted.

**STATEMENT OF THE CASE**

More than twenty years after the alleged crime, Gail Ritchey was indicted for the aggravated murder in violation of O.R.C. 2903.01 (Count One – murder with prior calculation and design) and murder in violation of O. R.C. 2903.02 (Count Two – purposeful killing of another) occurring in Geauga County, Ohio in 1993.

**Pretrial Proceedings Regarding Admissibility of Expert Testimony**

Because of the lapse of time between the alleged homicide and the indictment, the State was required to utilize a medical examiner, Dr. Joseph Felo, who did not perform the autopsy. Dr. Felo reviewed the autopsy report prepared by Dr. Robert Challener, a Cuyahoga County

assistant coroner who performed the original autopsy in 1993. Dr. Challener had opined that there was a live birth followed by homicide.

Dr. Felo opined that there was a live birth. At trial, he based that conclusion entirely on the fact that three samples of lung tissue taken during the autopsy evinced coloration consistent with inflation -- thus indicating that the tissue had taken in air. The coloration was noted in the autopsy report and also observed by Felo in his examination of the preserved slides.

A pre-trial evidentiary "Daubert" hearing was held. At the hearing, Felo testified that he had considerable experience in forensic pathology and the trial court qualified him as an expert without objection. Daubert Hearing transcript (D.H.T.) at 7-15. Felo did not work with the examining assistant county coroner on the autopsy in this case.

Felo's hearing testimony focused on the microscopic analysis of three tissue slides taken from the lung. D.H.T. 17. Felo testified that, by examining the degree and characteristics of the expansion of the small air spaces (alveoli), it was possible to determine if the baby breathed prior to death, i.e. whether there was a live birth. D.H.T. 18. According to Felo, the alveoli open when air is inserted into them. If the air is actively infused by an outside source, *e.g.* during a resuscitation attempt, the alveoli will be distended. This distended appearance is not present when the air is passively taken in through breathing. D.H.T. 19-20. Felo offered no quantification of what constitutes "distended" vs. "non-distended" alveoli, nor did he describe how the distended and non-distended differ in appearance. Moreover, Felo provided no authority for his distended-vs-non-distended theory.

Felo testified that decomposition could account for air in the alveoli but that he observed no signs of decomposition in this case. D.H.T. 20. Felo further testified that moving the body would not cause aeration. D.H.T. 21. As for animal mutilation, he opined that this would not

account for aeration because lungs would have been compressed in the process. At the same time, on cross-examination, he acknowledged preparing a report on August 20, 2021, in which he agreed that decomposition, animal activity and autopsy manipulation could "certainly" account for aeration.  D.H.T. 46. He acknowledge that the autopsy procedure itself could have introduced air into the alveoli.  D.H.T. 48-49.

Felo acknowledged that there are criticisms in the scientific literature about the reliability of microscopic examination (his technique) as probative of live birth.  D.H.T. 22. He did not know of any literature or peer-reviewed studies that were consistent with his observations. D.H.T. 22. He further testified that such corroboration did not exist and, indeed, was impossible: Instead, he relied on "individual experiences and case reports."  Felo offered no details about what these anecdotal case studies revealed or whether the anecdotal case studies were subject to peer review or other critical analysis.

Felo stated that, ultimately, he relied on his own "experience and the experience that I was taught and plus the experience of colleagues at work." D.H.T. 23. In this last regard, he did not testify that either the assistant county coroner's autopsy (performed in 1993) or Felo's reports in this case were even reviewed by his colleagues at the Cuyahoga County Medical Examiner's Office.  With respect to whether other medical examiners use microscopic analysis as a standard operating procedure in pediatric autopsy in general, Felo could only say that he hoped so.  D.H.T. 25.

Felo testified that his observation of the three slides indicated that approximately 55 to 60 percent of the alveoli depicted exhibited expansion consistent with normal breathing, 40 percent exhibited distention consistent with aggressive aeration (i.e. not the result of breathing) and that 10 percent exhibited no aeration.  D.H.T. 51-52. He testified that the 55 to 60 percent figure

6

caused him to opine that there was a live birth. He further testified that if only 5 to 20 percent of the alveoli exhibited aeration consistent with breathing he would not have diagnosed a live birth. D.H.T. 63-64. He offered no explanation for what percentage of aeration consistent with breathing was required to offer a diagnosis of live birth, or what error rate was being employed in his determination to offer an opinion as to live birth. He did not testify to any authority regarding what percentages were mentioned in professional literature, or accepted by other experts.

In reviewing the autopsy prepared by Challener, Felo testified that, had he performed the autopsy, Felo would have taken more than three slides and, unlike Challener, would have submitted the entire lung for microscopic preparation. D.H.T. 45. At the very least, Felo would have harvested enough lung tissue to make twice as many as the three slides prepared. D.H.T. 44. Felo noted that the three lobes of the lung that was examined (the other lung having been removed from the body, presumably by an animal) were described vaguely as to their color and no observations were made regarding their texture and consistency. D.H.T. 29. The colors reported in the autopsy included "pink-orange," which Felo stated might mean partial aeration though he indicated that such color descriptions were subjective. D.H.T. 31.

Felo testified that it was very important to ensure that the slides prepared from the lung came from separate portions of the lung in order to garner a representative sample before opining about a live birth. D.H.T. 39-40. He acknowledged that he did not know from where the slides were taken as the locations of the slides were not documented. D.H.T. 67. He nonetheless believed he was viewing a representative sample because he believed Challener would have taken representative samples and because there was enough variance in appearance to suggest the slides were taken from separate areas of the lung. D.H.T. 39-40.

7

The trial court permitted Dr. Felo to testify about live birth at trial.

*Ruling Prior to Trial That State's Expert Would Be Able to Rely on Autopsy Protocol and Procedure*

Over objection, the trial court ruled in limine that Dr. Felo could testify on the basis of examinations and testing performed in the original autopsy, including the original tissue testing.

*Ruling in Limine Excluding Defense Evidence of Dissociative Disorder*

Prior to trial, the State moved the trial court to exclude a defense expert's testimony that would have indicated to a jury that Gail Ritchey exhibited symptoms of dissociative disorder, a condition in which the person suffers a temporary loss of conscious awareness. This condition often manifests itself in pregnancy denial, whereby a woman has a lack of awareness of her ongoing pregnancy. Women who suffer from this condition will deliver their children in a dream-like state, with a blurred and muffled sense that they are giving birth, oftentimes not being aware of their child having moved or uttered a sound. Moreover, after birth, the temporary loss of conscious awareness terminates and the women often return to their normal activities, as if nothing has happened. Over the objection of the defense, the trial judge granted the State's motion in limine and the defense was unable to introduce this evidence.

**Trial Proceedings and Sentencing**

Trial by jury was commenced in 2022. A defense motion for directed acquittal on the basis that venue did not lie in Geauga County was denied. Over defense objection, the jury was instructed that venue for the offense lay where the body was recovered. The trial court rejected a defense proposed jury instructions that would have instructed the jury that a verdict of guilty required a finding beyond a reasonable doubt that an element of the offense was committed in Geauga County; the trial court also denied a defense-proposed alternative instruction that the

8

jury could consider the location where the corpse was recovered only if they first concluded that they could not reasonably ascertain the venue where the homicide occurred.

The jury returned a verdict of not guilty of Count One, aggravated murder, and guilty of Count Two, murder. The defendant was sentenced to fifteen years to life imprisonment.

On appeal, the Eleventh District Court of Appeals, Geauga County, Ohio affirmed. The issues raised on appeal included all issues presented in the within petition for habeas relief.

A timely discretionary appeal was then taken to the Ohio Supreme Court. Again, the issues raised in that appeal included all issues presented in the within petition for habeas relief. The Ohio Supreme Court declined to hear the appeal.

A timely petition for certiorari was then presented to the United States Supreme Court. The issue presented in Ground 1 of the within petition for habeas was the subject of the certiorari petition. On October 7, 2024, the United States Supreme Court denied certiorari.

**FACTUAL SUMMARY**

On March 25, 1993, a dismembered infant corpse was recovered on a roadside in Geauga County, Ohio. The body had apparently been ravaged by one or more animals and run over by a vehicle. The left lung, spleen, kidneys, stomach, and small intestine were missing as well. Trial Transcript (T.) at 645, 663, 684, 696-97.

Gail Ritchey was the mother of the infant corpse, as determined by DNA analysis more than 25 years later. In an interview with the police immediately prior to her arrest in 2019, Ms. Ritchey admitted that she had given birth in the bathroom of a Shaker Heights, Ohio home (i.e. in Cuyahoga County) in approximately February, 1993. T. 833-36 (recounting playing of videotaped interview admitted as State's trial exhibit 7). Ms. Ritchey worked as a nanny at the home. The delivery had come as a surprise; Ms. Ritchey experienced discomfort, went to the

9

toilet, and the baby was delivered into the toilet. The infant was still and Ms. Ritchey recalls no movement or sound from the infant. Ms. Ritchey placed the infant's body in a garbage bag and put the garbage bag in the trunk of her car. She cleaned up the bathroom and continued to nanny the children until the end of the workday, when she returned to her home in Cuyahoga County. The garbage bag remained in her car trunk. More than one week later, Ms. Ritchey drove to Geauga County, removed the bag from her trunk and dumped the bag near a church youth camp at which she served as a counselor. The camp was near where the body was found. *Id.*

In the thirty days preceding recovery of the body, there had been a number of above-freezing-termperature days. Defense trial exhibit L. The temperature of the body at recovery was 50 degrees Fahrenheit. T. 669.

A critical issue in the case was whether there was a live birth or whether the infant was stillborn. Dr. Felo testified at trial that, in his opinion, the infant was born alive. T. 683. All injuries were post-mortem. T. 692-93. Felo's testimony was consistent with his hearing testimony described above and relied in significant part upon the autopsy report. T. 684. While Dr. Felo acknowledged that decomposition could occur at above-freezing temperatures, he opined that there was no decomposition in the lungs. T. 714, 765.

Dr. Felo acknowledged that there was criticism among scientific professionals about relying on lung microscopy to determine if there was a live birth. T. 720. He nonetheless based his opinion on his own experience as opposed to scientific literature or peer-reviewed studies.

Dr. Felo's opinion was disputed by the defense forensic pathology expert, Dr. Kent Harshbarger. Dr. Harshbarger opined that the missing body parts undercut the scientific reliability of any opinion that there was or was not a live birth in this case. T. 888. Harshbarger noted that there was evidence of decomposition on the skull, which means that bacteria was

10

present that could have accounted for expansion of the lung tissue. T. 89-92. Harshbarger noted that the lungs could have expanded as a result of animal activity having forced air into the lungs, and/or from bacterial decomposition. T. 897. He noted that the lung expansion present in the slides did not appear to be that of a uniformly-aerated breathing infant. T. 889. As a result of the unknown information regarding the missing body parts, the evidence of decomposition, and the lack of prenatal care (as admitted by Gail Ritchey in her statement to the police), Harshbarger opined that a determination of live birth was not possible to a reasonable degree of medical certainty. T. 969.

## GROUNDS FOR RELIEF

There are five grounds for habeas relief presented herein. They are as follows:

**Ground One: Ms. Ritchey was denied her Sixth and Fourteenth Amendment right to confrontation when the prosecution was permitted to introduce the autopsy report and have Dr. Felo testify about the contents of the report prepared when Felo did not participate in the autopsy performed by the non-testifying Dr. Challenor.**

**Ground Two: Ms. Ritchey was denied her Sixth and Fourteenth Amendment right to trial by jury when the trial court instructed the jury in a manner that deprived the jury of the ability to properly determine whether venue had been proven as required under Ohio law.**

**Ground Three: In violation of Fifth and Fourteenth Amendments, the evidence of venue was insufficient to sustain a conviction.**

**Ground Four: In violation of the Sixth and Fourteenth Amendments, the trial court denied Ms. Ritchey the right to a trial comporting with due process when it refused to allow testimony regarding dissociative disorder.**

**Ground Five: In violation of Fourteenth Amendment due process, the trial court improperly permitted expert testimony from Dr. Felo that there was a live birth.**

11

**Ground One:   Ms. Ritchey was denied her Sixth and Fourteenth Amendment right to confrontation when the prosecution was permitted to introduce the autopsy report and have Dr. Felo testify about the contents of the report prepared when Felo did not participate in the autopsy performed by the non-testifying Dr. Challener.**

Dr. Felo, a forensic expert who did not participate in the autopsy and preparation of tissue slides, was improperly permitted to testify as to contents of the coroner's report and the results of scientific testing conducted during the autopsy; similarly, the report and test results, themselves, should not have been admitted into evidence.

Dr. Felo's hearsay testimony and the admission of the autopsy file without the accompanying testimony of the person(s) who participated in the autopsy violates the Confrontation Clause of the Sixth Amendment. The Confrontation Clause guarantees the defendant the opportunity to confront their accusers through the crucible of cross-examination. *Crawford v. Washington,* 541 U.S. 36 (2004), *Melendez–Diaz v. Massachusetts*, 557 U.S. 305 (2009), *Bullcoming v. New Mexico*, 564 U.S. 647 (2011).

In *Garlick v. Lee,* 1 F.4th 122 (2d Cir. 2021), the Second Circuit Court of Appeals addressed the same issue presented in this First Ground and concluded that the admission of an autopsy report and testimony regarding that report by a doctor not involved in the autopsy constituted an unreasonable application of clearly established Supreme Court law, to wit, the *Crawford, Melendez-Diaz, Bullcoming* trilogy.  In *Garlick,* the medical examiner who prepared the autopsy was unavailable to testify at trial and a different medical examiner testified as to its contents.  The Second Circuit traced the Supreme Court's jurisprudence from *Crawford* and going forward and noted that the autopsy was a formal document that constituted "'[a] solemn

declaration or affirmation made for the purposes of establishing or proving some fact.'" *Id,,* at 134, quoting *Crawford,* 541 U.S. at 52 (brackets in *Garlick*). Pursuant to *Garlick* this Court should likewise hold that the state courts unreasonably applied clearly established Supreme Court Confrontation Clause precedent. The post-*Garlick* Supreme Court decision in *Smith v. Arizona,* 602 U.S. 779 (2024) does nothing to disturb this conclusion. *Smith* recognizes the traditional primary purpose test and further recognizes that a key consideration is whether the prior report is offered for its truth – in this case, Challener's primary purpose was to document a cause of death for future adjudications and official determinations, and Felo's testimony treated the autopsy report for the truth of the matters asserted therein.

The Warden relies upon *Maxwell v. Shoop,* No. 1:21-cv-318, 2025 U.S. Dist. LEXIS 52276 (N.D. Ohio March 21, 2025) for the proposition that an autopsy report's Confrontation Clause status is not settled. Respectfully, *Maxwell* takes too narrow a view of what clearly established Supreme Court precedent entails. As *Garlick* explained, there is no basis to distinguish the scientific testing in *Bullcoming* from the more-encompassing testing and analysis that characterizes an autopsy report. Moreover, even *Maxwell* recognizes that, at some point, the significance of an autopsy report in the context of the trial could create due process violations when it is presented via surrogate testimony. In this case, where the issue of live birth was critical, that line has been crossed.

The Warden, in her return of writ, argues that Dr. Felo's own analysis of the tissue samples caused the admission of the autopsy report to be harmless. But the Eleventh District Court of Appeals decision belies that conclusion. The Eleventh District's opinion, at paragraphs 5 through 7, notes that Felo walked the jury through Challener's conclusion that there was a live birth, with postmortem injuries. Felo also testified about Challener's observations regarding the

air sacs. As discussed above in the statement of the evidence at trial, Dr. Felo made repeated references to the autopsy report and Dr. Challener's findings. Felo's testimony included significant amounts of affirmation of the Challener findings. *Accord, Ganthier v. Superintendent, Green Haven Correctional Facility*, Slip Copy, 2025 WL 2452386 (E.D. N.Y.) (surrogate testimony that included expert's own observations as well still violated clearly established Supreme Court Confrontation Clause precedent).

Moreover, Felo's testimony regarding his own observations of the air sacs necessarily relies upon his belief that he was examining tissue samples from the correct corpse – an assumption that totally relies upon Challener's autopsy and attendant documents.  Without Challener to cross-examine, the defense could not ascertain whether the slides in question came from the corpse or, assuming the slides did come from the corpse, whether the slides constituted representative samples from three separate locations within the lung or whether they all came from the same location.  Felo acknowledged that this could make a difference and testified that he assumed Challener would not have taken all slides from the same location – an assumption about which the defense could not confront Challener.  T. 748-55.  *Ganther, supra.*

In the end, the prosecution benefitted greatly from Challener's testimony that was never subject to the crucible of crossl-examination that the Confrontation Clause demands.

**Ground Two:   Ms. Ritchey was denied her Sixth and Fourteenth Amendment right to trial by jury when the trial court instructed the jury in a manner that deprived the jury of the ability to properly determine whether venue had been proven as required under Ohio law.**

As the Eleventh District recognized in its opinion in this case, under Ohio law, venue must be proven beyond a reasonable doubt.  Venue for a homicide normally lies solely in the county where the homicide is committed.  O.R.C. 2901.12(A). However, when there is evidence

that a homicide was committed other than where the body was recovered, a jury can resort to the alternative method of determining venue in a homicide case by reference to the location where the body was recovered, *but only if* the jury first decides for itself whether it could reasonably determine the county where the homicidal act took place.  O.R.C. 2901.12(J).

In accordance with the defense suggested jury instructions filed on April 2, 2022, the jury should have been instructed that venue would lie in Geauga County only if the jury found beyond a reasonable doubt either that:

**Primary Optio**n:  An element of the offense was committed in Geauga County.

or

**Secondary Option:**  The jury cannot reasonably determine in what county any element of the offense had been committed, and the jury finds that the body was recovered in Geauga County.

Instead, the trial court simply instructed the jury that venue had to be determined by where the body was recovered.

Here, there was insufficient evidence (indeed, no evidence other than the location of the corpse) that the crime had been committed in Geauga County, so the jury would have been unable to find guilt based on the Primary Option (an option that the trial court did not provide the jury). But, as to the Secondary Option, there was substantial evidence that an element of the offense (indeed, the entire offense) had been committed in Cuyahoga County.  Had the jury been instructed in accordance with Ohio law that, before the jury could look to the county where the corpse was found, the jury must first decide whether it could determine for itself in which county an element of the offense had been committed, the jury may well have determined that an

15

element of the offense occurred in Cuyahoga County and thus would have acquitted (because it would never have concluded that venue lay where the body was found).

But the trial court 's instruction took all of this away from the jury, effectively directing a verdict that a jury could not reasonably determine that an element of the offense occurred in Cuyahoga County despite substantial evidence that the offense did occur in Cuyahoga County. In so doing, the trial court violated Ms. Ritchey's right to trial by jury and due process, U.S. Const. Amends. VI, XIV.

The Warden argues that this is, at most, a claim that an incorrect instruction was given regarding state law. But it is more than that. In Ohio, venue must be proven beyond a reasonable doubt to a jury – a proposition that the Eleventh District stated explicitly at paragraph 20 of its decision in this matter. And clearly established Supreme Court precedent recognizes that those factual findings that are necessary for a guilty verdict must be made by a jury. *E.g., United States v. Gaudin,* 515 U.S. 506, 510-11 (1995), citing *Sullivan v. Louisiana,* 508 U.S. 275, 277-78 (1993).

In *Gaudin,* the Court found a denial of the constitutional right to trial by jury when the trial court decided whether a statement was "material" for purposes of a violation of 18 U.S.C. 1001, making a false statement on a HUD loan document. The Court held that the materiality question was required to be decided by a jury, just as the jury would also have to decide whether the statement was false.

Applying this clearly established precedent to the instant case, the trial court's determination that the venue of the alleged homicide could not be ascertained was also a denial of Ms. Ritchey's right to have the jury make this determination. Only if the jury determined that

16

it could not conclude that the homicide took place in Cuyahoga County should the jury have been able to consider the question of venue on the basis of the location of the body when found.

That the factfinding role of the jury was taken from them is apparent when one reads the Eleventh District's decision  At paragraphs 32 – 33, the Eleventh District observes that Gail Ritchey's testimony was not corroborated regarding where the birth took place – and, based on Dr. Felo's testimony that the child lived a matter of minutes or hours, where death would have occurred.  But it is precisely these questions of witness credibility that a jury must determine. Just as *Gaudin* condemned depriving Gauding of the right to have his jury determine materiality in addition to falsity, so too did the state court deprive Ms. Ritchey of the right to have her jury determine whether there was uncertainty about Cuyahoga County as a venue before resorting to the secondary venue finding.

**Ground Three:  In violation of Fifth and Fourteenth Amendments, the evidence of venue was insufficient to sustain a conviction.**

The argument set forth in Ground Two is hereby incorporated by reference as if set forth in full.  Because there was insufficient evidence that an element of the offense occurred in Geauga County and because there was insufficient evidence that a jury could not have reasonably determined that an element of the offense occurred in Cuyahoga County, the only verdict that a jury could reasonably have reached was that venue did not lie in Geauga County – because a rational jury could not have resorted to the alternative provision of O.R.C. 2901.12(J) that permits venue to be found in a homicide case where the corpse is found. Thus, the only rational verdict in this case, a case tried in Geauga County, was not guilty on the basis of insufficient evidence of venue.

17

A verdict not supported by sufficient evidence, which is what happened in this case, is violative of the Fifth and Fourteenth Amendments to the United States Constitution. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Here the state courts unreasonably applied *Jackson* in ignoring the evidence that, even in the light most favorable to the prosecution, failed to establish that the jury would not have concluded that venue lay in Cuyahoga County.

The Warden responds that venue is not an element of the offense. But that ignores the fact that venue is something whose proof is essential to a conviction, and thus to punishment. The Supreme Court has previously recognized, through clearly established precedent, that any fact that is essential for punishment must be proven to a jury. *See, e.g., Gaudiin, Apprendi v. New Jersey,* 530 U.S. 466 (2000).

To be sure, the United States Supreme Court has recently held that failure to prove venue does not preclude a retrial in the appropriate venue. *Smith v. United States,* 599 U.S. 236 (2023). But that simply means that the remedy for this Ground Three is a new trial as opposed to a dismissal of the charges – it does not change the constitutional violation that requires relief via this petition.

**Ground Four:  In violation of the Sixth and Fourteenth Amendments, the trial court denied Ms. Ritchey the right to a trial comporting with due process when it refused to allow testimony regarding dissociative disorder.**

Evidence of dissociative disorder is admissible in Ohio when offered to explain the voluntariness of the actions of the defendant or the defendant's lack of affect. The defense provided notice of the expert testimony of Dr. Diana Barnes, who would testify about pervasive pregnancy denial/concealment. The State objected, successfully, to the admission of the evidence

18

on the basis that it was effectively an attempt to admit evidence of diminished capacity, which is forbidden. Exhibits 31, 34. But the State, and the trial court missed the two purposes for which the evidence should have been admitted, as discussed by the defense in Exhibit 33 to the Return of Writ.

The first purpose of this testimony was to explain why and how Gail Ritchey, after delivery, could transition almost immediately to caring for the children for which she was a nanny. Ms. Ritchey's ability to pivot back to her pre-delivery tasks is consistent with pregnancy dissociation, a condition where a pregnant woman fails to emotionally bond with the fetus during the period of gestation. This has nothing to do with whether Ms. Ritchey had the mental capacity to form a purpose to kill. Rather, this testimony of Dr. Barnes helps explain to a jury what is otherwise a foreign concept: "How could Gail Ritchey go about the rest of her day just minutes after delivery?"

The second purpose was also unrelated to mental capacity. The dissociative state about which Dr. Barnes would have opined affects the voluntariness of actions, not mental status. As Dr. Barnes' report indicates, dissociation is akin to a dream-like state, similar to sleepwalking. Dissociation thus goes to the voluntariness of one's actions. In *State v. Ireland*, 155 Ohio St.3d 287, 121 N.E.3d 285, 2018-Ohio-4494, the Ohio Supreme Court addressed the question of dissociation in a decision containing multiple opinions. Two members of the Court (Fischer, O'Donnell, JJ.) were responsible for a lead opinion that viewed dissociation as an affirmative defense that related to the voluntariness of the defendant's actions. Two other members of the Court (Kennedy, DeWine, JJ., dissenting) viewed dissociation as an aspect of voluntariness that the State was required to disprove beyond a reasonable doubt. Regardless of whether dissociation is viewed as an affirmative defense or simply an aspect of the prosecution's burden

to prove voluntariness, *Ireland* stands for the proposition that dissociation affects voluntariness, i.e. the requirement that the defendant employ a voluntary actus reus. Significantly, both the lead opinion written by Justice Fischer and the dissenting opinion written by Justice Kennedy have parted ways with, and declined to adopt, the separate concurring opinion (DeGenaro, French, JJ.) that viewed dissociation as implicating diminished capacity and thus inadmissible.

The Warden responds that this issue was not presented on direct appeal as a constitutional claim. See Exhibit 43. But the Warden ignores the fact that the argument on direct appeal cited specifically to the dissenting opinion of Ohio Supreme Court Justices Kennedy and DeWine in *Ireland,* which specifically relied upon Fourteenth Amendment due process for its holding that dissociative disorder was central to Ohio's statutory requirement that there be a voluntary actus reus. *Ireland,* at ¶¶ 98-99.

The Warden also responds that admission of evidence of dissociative disorder is precluded by the fact that Ohio does not recognize a diminished capacity defense. But, as discussed above, the majority of the Ohio Supreme Court that decided *Ireland* recognized dissociative disorder as relating to the voluntariness of the defendant's actions and not to diminished capacity. Accordingly, the question is whether exclusion of evidence that is material to an element of the offense is a violation of Fourteenth Amendment due process. The Eleventh District's failure to recognize this distinction was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. §2254(d)(2).

**Ground Five: In violation of Fourteenth Amendment due process, the trial court improperly permitted expert testimony from Dr. Felo that there was a live birth.**

At the outset, Ms. Ritchey respectfully takes issue with the Warden's assertion that this Ground was defaulted because it was not raised in the Ohio Supreme Court as a constitutional

question.  The Memorandum in Support of Jurisdiction filed in the Ohio Supreme Court (Exhibit 48), states as follows at page 11:

> **Proposition of Law II: Expert testimony may not be premised solely on the expert's anecdotal experience, unsupported by research, scientific literature or general acceptance in the scientific community.**
>
> The trial court should not have permitted Dr. Felo to opine that there was a live birth. Dr. Felo's testimony does not meet the admissibility standard set forth in Evid. R. 702. Admission of his opinion also violated the right to due process under the Fourteenth Amendment and Article I, Section 10 of the Ohio Constitution.

Exhibit 48 at 11.  This more than sufficiently presented the question in Ground Five as a federal constitutional question.

Turning to the merits, the trial court should not have permitted Dr. Felo to opine that there was a live birth when the opinion was not based on reliable scientific principles and practices. Ohio guarantees criminal defendant's a liberty interest that scientific evidence will be drawn from reliable scientific principles.  The Fourteenth Amendment requires state prosecutions to uphold state-created liberty rights.  Moreover, the Fourteenth Amendment, itself, guarantees that criminal defendants will not be convicted on unreliable evidence.

Dr. Felo acknowledged that the literature was critical of his decision to base his conclusions solely on microscopic examination.  He offered no evidence of scientific literature, peer-reviewed studies, past experiments or any other scientific opinion that supported his reliance solely on microscopic examination.  Moreover, Felo testified that he needed more than 20 percent of the alveoli to be passively aerated but that he did not need 50 percent aeration, yet offered no explanation for these figures.  Moreover, the microscopic examination was not performed in a reliable manner because, as Felo acknowledged, there were multiple opportunities

for post-mortem aeration, either by movement of the corpse, animal scavenging or during the autopsy. Moreover, having testified that it was very important that the slides be drawn from separate areas on the lung, Felo admitted that he did not know from where the slides were taken.

All of this combined to undermine the scientific validity of Felo's testimony, thus violating Fourteenth Amendment due process.

## DEMAND FOR RELIEF

Wherefore, petitioner Gail Ritchey requests the following relief:

1) That this Court issue a writ of habeas corpus to have Petitioner brought before the Court that she may be discharged from her unconstitutional confinement and restraint; and,

2) For such other relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Steven L. Bradley*
STEVEN L. BRADLEY (0046622)
Marein & Bradley, LLC
1300 East 9th Street, Suite 1000
Cleveland, Ohio 44114
PHONE: (216)781-0722
FAX (216)781-6010
steve@mareinandbradley.com

## CERTIFICATE OF SERVICE

I hereby certify that one true copy of the foregoing has been served on all parties at the time of filing via the Clerk's electronic service.

*/s/ Steven L. Bradley*
STEVEN L. BRADLEY (0046622)