**THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GAIL M. RITCHEY, | : | |
| | : | CASE NO. 1:25-CV-02110 |
| **Petitioner,** | : | |
| | : | JUDGE JOHN ADAMS |
| v. | : | |
| | : | MAGISTRATE JUDGE |
| WARDEN ERIN MALDONADO, | : | JONATHAN D. GREENBERG |
| | : | |
| **Respondent.** | : | **HABEAS CORPUS** |
| | : | |

## RESPONDENT'S SUR-REPLY

### I.    INTRODUCTION

Petitioner Gail Ritchey, (hereinafter "Petitioner" or "Ritchey,") inmate #W109-298, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. §2254. Respondent, Erin Maldonado (hereinafter "Respondent"), is the Warden of the Ohio Reformatory for Women, Marysville, Ohio. As Warden, she maintains custody of Ritchey, pursuant to a Judgment Entry issued by the Geauga County Court of Common Pleas, upon Ritchey's conviction of murder. (Doc. 7-1, PageID #: 372-74).

On December 19, 2025, Respondent filed a Return of Writ and the state court record. (Doc. 7, PageID #: 38-75). Ritchey filed her Traverse on February 23, 2026. (Doc. 10, PageID #: 1991-2012). Respondent files the instant reply in support of her argument that the Petition should be denied and/or dismissed.

## II.   STATEMENT OF FACTS

Consistent with this Court's order that all briefs shall contain a summary of the facts upon which they rely (Doc. 4, PageID #: 32), Respondent includes the following binding factual findings:

[*P2] On June 6, 2019, the Geauga County Grand Jury returned an Indictment charging Ritchey with Aggravated Murder, a felony in violation of R.C. 2903.01(A), and Murder, a felony in violation of R.C. 2903.02(A). The charges were tried before a jury between March 28 and April 4, 2022. The following relevant testimony was presented at trial:

[*P3] Cheryl Jenkins testified that, while delivering newspapers on the morning of March 25, 1993, she discovered the body of a baby on a road in Geauga County. The body was in "bad shape": "he was missing an arm and a leg and the skin on his belly." She contacted law enforcement.

[*P4] Scott Neihus, the Chief of Police for Chardon, testified that in 1993 he was a detective in the Geauga County Sheriff's Office. On March 25 of that year, he responded to a report that the body of an infant had been discovered on Sidley Road in Thompson Township. Neihus accompanied the infant to Geauga Hospital where he was pronounced dead and then transferred to the Cuyahoga County Coroner's Office for autopsy. Several days later, Neihus discovered a garbage bag in the tree line of Mosley Road, "approximately two to three-tenths of a mile" from the location of the body. The bag had been torn open and inside was a clear plastic bag containing a red liquid.

[*P5] Doctor Joseph Felo, the Chief Deputy Medical Examiner for Cuyahoga County, testified as an expert in the field of forensic pathology to the following: Doctor Robert Challener, now deceased, was the Chief Deputy Coroner for Cuyahoga County who performed the autopsy of the child. Felo reviewed the autopsy protocol prepared by Challener as well as microscopic slides of body tissues, toxicology and x-ray reports, and autopsy photographs. Two anatomic diagnoses were made: "full term live born male infant" and "postmortem injuries of head, neck, trunk and extremities." Based on Challener's autopsy, the Geauga County Coroner classified the death as a "homicide" and identified the cause of death as "undetermined violent cause."

[*P6] Using a photograph of the right lung (except for "hilar remnants," the left lung was missing), Dr. Felo opined: "Based on the color and the circumstances, it gives an indication that this child breathed for some time because when the lungs

are in the womb, they are going to be more of a brown color and collapsed, much like the color of the liver. So the fact that there is a more pink color means that the blood that was normally present there has now been pushed out to allow for the air sacs to expand, so the color helps with determining that this child was born alive or took a breath. The surface of the lung has a very uniform color, so it's not blotchy or patchy which would be, with the uniform color, would be the child breathed and it expanded the lungs and squeezed out the blood that was in there while the child was developing in the womb, so now it's replaced with air. Had this been forced air into the lungs, it would be more of a splotchy brown separated by the pink color. So that uniform color indicates breathing."

[*P7] Considering Dr. Challener's microscopic examination of the lung tissue, Dr. Felo testified: "Portions are well aerated; that means air has gotten into the air sacs and distended them. The scattered squames are the skin cells that are from the fetus while in the womb. They get shed off and into the amniotic fluid which is the fluid that bathes the baby while developing in the womb, so some of those are present in the air spaces. And then [Dr. Challener] describes atelectasis, that's collapsed or non-expanded air sacs."

[*P8] Dr. Felo independently reviewed the three existing slides of lung tissue from the child.

> He concluded: [L]ess than 5 percent of all lung tissues consist of non-expanded air spaces primarily in the subpleural regions; that's my microscopic description of atelectasis; so those are areas of the lungs that did not get air introduced into them into the sacs and they are mostly at the furthest away areas. When we breathe in it goes to the pleural surface; that's the outer surface of the lungs. Those are areas that the air is least likely to get in, so that's not surprising. And that was less than 5 percent of all of the tissues I looked at. [A]pproximately 40 percent of all lung tissues consist of rounded and distended optically clear air spaces. What that means is those are the alveolar sacs which is where the business of the lung-where air which has oxygen exchange[s] with blood circulating through the body so that we breathe in oxygen and we expel carbon dioxide; that's what the alveoli, the alveolar air sacs are. About 40 percent of those are rounded and distended; that means they are over-expanded and they have been cleared out of any debris which would be normal in the lung tissues. My third conclusion is that approximately 55 percent to 60 percent of all lung tissues consist of non-distended open air spaces and almost all have cellular and acellular eosinophilic material within the air spaces. What that means is the majority of the lung tissues have open air spaces caused by the child breathing and they're not over-distended. They are not collapsed. These are

evidence that this child breathed. And almost all of them have acellular and cellular eosinophilic, which means pink underneath the microscope, material. Those cells are normal cells that help secrete liquid to keep the air sacs open and there's also some debris which is from the amniotic fluid that Doctor Challener specifically called squames. So that is normal air sacs for an infant of certainly less than 24 hours of life. And then finally I say that all lung tissues are well preserved; that means that there's no signs of decomposition or breakdown with no evidence of autolysis which is the chemical breakdown and/or no bacterial colonies which is something that often will occur in body tissues. The bacteria, as I described, can colonize and breakdown the tissues. There's no evidence of that type of decomposition change.

[*P9] With respect to the 40 percent of the tissues that were "rounded and distended," Dr. Felo explained that this can be caused by "forced air into the lungs" or "bacterial overgrowth [which] can cause gasses to form." The lack of evidence of decomposition precluded the possibility of bacterial overgrowth causing the distention.

[*P10] With respect to the 55 to 60 percent of "nondistended open air spaces," Dr. Felo explained this was indicative of passive or normal breathing: "It's not too much air coming in where it's getting over-expanded but it's enough air so that it opens up those air spaces."

[*P11] Based on the foregoing, Dr. Felo asserted to a reasonable degree of scientific certainty that it was a live birth of a near or full term infant. Felo could offer no opinion as to how long the baby was alive or how long the baby had been exposed. He described the child's life as "not long" which could mean seconds or hours.

[*P12] Don Seamon, a detective with the Geauga County Sheriff's Office, testified that, in 2018, the effort was undertaken to use DNA from the child's tooth bud and compare it with online DNA databases in order to determine the child's family. Eventually, through such efforts, law enforcement was able to identify Ritchey as the mother of the child.

[*P13] Detective Seamon interviewed Ritchey and a videorecording of that interview was played for the jury. In the interview, Ritchey (age 23 at the time of birth) stated that she did not realize that she was pregnant until about three months prior to delivery, when she ceased to menstruate. She was unaware of how far along she was in the pregnancy. She did not tell anyone that she was pregnant. She was working for a family as a nanny in Shaker Heights. During a weekday in "winter," she gave birth at the Shaker Heights residence. She did not look at the child and

was not aware of its sex. She does not remember if the child moved or made any noise although it was "possible" the child might have done so. Not knowing what to do, she put the child in a garbage bag and put the bag in the trunk of her car. Several days or a week later she spent a weekend at Camp Koinonia in Ashtabula County. During the weekend she drove someplace "I don't know where" and laid the bag in the woods. She was not aware that the child had been found until the police contacted her parents as part of their genealogical investigation.

[*P14] Doctor Kent Harshbarger, the Montgomery County Coroner, testified that he examined Dr. Challener's autopsy report and the associated materials from the Cuyahoga County Coroner's Office. Considering these materials, Harshbarger concluded that it was not possible to determine whether the child was born alive. He noted that there have been documented instances of "stillbirth with expanded alveoli" and "known live birth with collapsed alveoli." Accordingly, the microscopic evaluation of lung tissue is not determinative. "Breathing, having expanded alveoli microscopically in my opinion is a useful data point but it is unreliable when all the other markers we use or other markers we typically have available to us allow for greater confidence by doing that [sic]. * * * In this case * * * we don't have many data points, other than the lung histology, and in my opinion that's not enough to conclude [with] reasonable scientific certainty that a live birth occurred."

[*P15] Dr. Harshbarger did not believe that the photograph of the right lung presented "a macroscopic or visual appears [sic] of a healthy, aerated, pink, expanded lung." Although a portion of the lung presented a "lighter red-pink color" consistent with expansion, there was no description in the coroner's report of the organ's texture which is "the only way to evaluate the histologic appearance or microscopic appearance." Dr. Harshbarger noted a number of ways in which the alveoli could be expanded artificially, such as by bacterial gasses or by compression of the chest which could occur during birth or through animal activity. Overall, he did not believe the lung's collapsed appearance was indicative of a live birth.

[*P16] On April 4, 2022, the jury returned a verdict, finding Ritchey not guilty of Aggravated Murder and guilty of Murder.

[*P17] On May 24, 2022, the trial court sentenced Ritchey to an indefinite prison term of fifteen years to life.

*State v. Ritchey*, Ohio 11th Dist. App. No. 2022-G-0025, 2023-Ohio-1625, ¶¶2-17.

**III.    ARGUMENT**

**A.    Ritchey's fourth and fifth ground for relief are procedurally defaulted.**

Respondent has argued two of Ritchey's grounds for relief are procedurally defaulted. Ritchey disagrees, but she is incorrect.

With respect to her fourth ground for relief, Ritchey argues that "on direct appeal [she] cited specifically to the dissenting opinion of Ohio Supreme Court Justices Kennedy and DeWine in [*State v.*] *Ireland*, [155 Ohio St.3d 287], which specifically relied upon Fourteenth Amendment due process for its holding that dissociative disorder was central to Ohio's statutory requirement that there be a voluntary actus reus." (Doc. 10, PageID #: 2010). "The Sixth Circuit has held that a petitioner does not fairly present a federal claim to the state court where his brief alleges only a general denial of the right to due process and a fair trial and 'relies on a number of state court cases but does not cite a single federal case.'" *Isreal v. Motley*, No. 6:10-CV-70, 2013 U.S. Dist. LEXIS 28756 at *11 (E.D. Ken. Jan. 10, 2013) (*citing Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2005)). "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). Ritchey failed to present her fourth ground for relief as a federal constitutional claim in her direct appeal.[1] The fourth ground for relief is procedurally defaulted.

With respect to her fifth ground for relief, Ritchey "takes issue" with Respondent's procedural default argument. Ritchey points out that she made a single reference to "the right to

---

[1] As Respondent previously noted, Ritchey's Memorandum in Support of Jurisdiction to the Supreme Court of Ohio did cite the Sixth and Fourteenth Amendments but she did not do so in her direct appeal.

due process under the Fourteenth Amendment." (Doc. 10, PageID #: 2010-11). Contrary to Ritchey's assertion, that is not "more than" sufficient to fairly present a federal constitutional claim. To the contrary, "a 'bare and isolated citation to the Fourteenth and Sixth Amendments' is insufficient to fairly present a federal claim to the state court." *Isreal*, *supra* (*citing Slaughter*). Ritchey's fifth ground for relief is also defaulted.

It does not appear that Ritchey has made any attempt to overcome the default, so her fourth and fifth grounds for relief must be dismissed.

**B.      Ritchey's grounds for relief lack merit.**

Mindful of this Court's order (Doc. 4, PageID #: 32), Respondent believes that the merits of Ritchey's grounds for relief have been thoroughly discussed. Ritchey's grounds for relief lack merit and should be denied.

## IV.      <u>CONCLUSION</u>

Based upon the above, and those in the Return of Writ, Respondent respectfully submits that the petition for writ of habeas corpus should be dismissed and/or denied. Respondent's defenses as set forth in the Return of Writ are governed by well-established federal precedent in the United States Supreme Court, as well as by the Sixth Circuit Court of Appeals. Because Respondent's defenses involve legal issues which can be resolved on the record without additional factual inquiry, there is no need for an evidentiary hearing. *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *Getsy v. Mitchell*, 495 F.3d 295, 310-311 (6th Cir. 2007) (*en banc*).

Likewise, no additional evidence is permitted in this case because "review under §2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011). Thus, clearly established Supreme Court precedent is that the state court judgment adjudicating the merits is required to be viewed in

the context of both the record and the law as it existed at the time the court issued its decision. *Id*., at 181–82, 185; *Greene v. Fisher*, 565 U.S. 34, 38 (2011). The limitations in *Pinholster* are virtually jurisdictional and apply to prohibit expansion of the record and to preclude evidentiary hearings. *Moore v. Mitchell*, 708 F.3d 760, 780-84 (6th Cir. 2014).

Finally, no certificate of appealability should be issued regarding the defaulted and meritless grounds in Ritchey's petition.

Respectfully submitted,

**DAVE YOST**
Ohio Attorney General

/s/Katherine E. Mullin
KATHERINE E. MULLIN (0084122)
Senior Assistant Attorney General
Criminal Justice Section
30 East Broad Street, 23rd Floor
Columbus, Ohio 43215
(614)644-7233/844-208-2297-fax
katherine.mullin@ohioago.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing *Respondent's Sur-Reply* has been electronically filed this 10th day of March 2026 and is accessible to all parties via this Court's electronic filing system.

s/Katherine E. Mullin
KATHERINE E. MULLIN
Senior Assistant Attorney General